**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KIMBERLEIGH DUFFIELD, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>THE ALLSTATE CORPORATION, ALLSTATE INSURANCE COMPANY, ALLSTATE VEHICLE AND PROPERTY INSURANCE COMPANY, ARITY, LLC, ARITY 875, LLC, and ARITY SERVICES, LLC,<br><br>Defendants. | Case No.: 1:25-cv-609<br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Kimberleigh Duffield ("Plaintiff"), on behalf of herself and all others similarly situated, and against Defendants The Allstate Corporation, Allstate Insurance Company, Allstate Vehicle and Property Insurance Company, Arity LLC, Arity 875 LLC, Arity Services LLC (collectively, "Defendants"), and alleges the following:

## I.  INTRODUCTION

1.  Defendants conspired to secretly collect and sell "trillions of miles" of consumers' "driving behavior" data from mobile devices, in-car devices, and vehicles.[1]

2.  Defendants used the illicitly obtained data to build the "world's largest driving behavior database," housing the driving behavior of over forty-five (45) million Americans.[2] Defendants created the database for two main purposes: (1) to support Defendants' car insurance business and (2) profit from selling the driving behavior data to third parties, including other car insurance carriers ("Insurers").[3]

---

[1] ARITY, https://arity.com/ (last visited Jan. 16, 2025).
[2] ARITY, "Vehicle Miles Traveled," https://arity.com/solutions/vehicle-miles-traveled/ (last visited Jan. 16, 2025).
[3] ARITY, *supra* note 1.

3.      Millions of Americans, including Plaintiff and Class Members, were never informed about, nor consented to, Defendants' continuous collection and sale of their data.

4.      Defendants covertly amassed a collection of "trillions of miles" of data and related data points by maintaining active connections with Plaintiff's and Class Members' mobile devices.

5.      Defendants achieved this by developing and integrating their software into third-party mobile applications ("apps").

6.      As a result, when Plaintiff and Class Members used these apps, Defendants could monitor their locations and movements in real-time, thereby allowing Defendants to surreptitiously collect a multitude of highly valuable data directly from consumers' mobile phones.

7.      The data collected by Defendants includes a phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data, which monitors details such as the phone's altitude, longitude, latitude, bearing, GPS time, speed, and accuracy.

8.      To encourage developers to adopt Defendants' software, Defendants paid app developers millions of dollars to integrate Defendants' software into their apps. Defendants further incentivized developer participation by creating generous bonus incentives for increasing the size of their dataset.

9.      According to Defendants, the apps integrated with their software currently allow them to "capture[] [data] every 15 seconds or less" from "40 [million] *active* mobile connections."[4]

10.     Once collected, Defendants found several ways to monetize the ill-gotten data, including by selling access to Defendants' driving behavior database to other Insurers and using the data for Defendants' own insurance underwriting.

---

[4] https://arity.com/solutions/real-time-insights/ (emphasis added).

11.     If a consumer requests a car insurance quote or has to renew their coverage, Insurers can access that consumer's driving behavior in Defendants' database. Correspondingly, the Insurer can use that information to increase their car insurance premiums, deny them coverage, or drop them from coverage.

12.     Defendants marketed and sold the data obtained through third-party apps as "driving" data reflecting consumers' driving habits, despite the data being collected from and about the location of a person's phone. Stated differently, that data in question may not have been collected when the particular consumer was actually driving their vehicle.

13.     Defendants have also begun purchasing data about vehicles' operation directly from car manufacturers, presumably to help account for inaccuracies inherent in its data set.

14.     Consumers, including Plaintiff, did not consent to, nor were they aware of Defendants' collection and sale of immeasurable amounts of their sensitive data. Pursuant to their agreements with app developers, Defendants had varying levels of control over the privacy disclosures and consent language that app developers presented and obtained from consumers.

15.     However, Defendants never informed consumers, including Plaintiff and Class Members, about their extensive data collection, nor did Defendants obtain consumers' consent to engage in such data collection.

16.     Similarly, Defendants never informed consumers about the myriad of ways that Defendants would analyze, use, and monetize their sensitive data.

17.     As described in more detail throughout this complaint, Defendants violated numerous state and federal laws, common law, state consumer protection statutes, and invaded Plaintiff's and Class Members' privacy.

CLASS ACTION COMPLAINT

18.     On information and belief, much of the driving data Defendants shared is improperly and inaccurately associated with Plaintiff. As a result, and in spite of her impeccable driving record, Plaintiff has paid higher insurance premiums than she would have in the absence of Defendants' course of conduct. Likewise, Plaintiff values her privacy, Defendants have violated her privacy in a multitude of ways, and she is highly offended by Defendants' course of conduct.

19.     Plaintiff brings this case on behalf of herself and the putative Class, which is comprised of millions of Americans who were never informed about, nor consented to, Defendants' continuous collection and sale of their driving data. Plaintiff and Class Members seek damages for the losses suffered as a result of Defendants' misconduct, and injunctive relief aimed at preventing Defendants from engaging in such practices in the future.

## II.     JURISDICTION

20.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member (including Plaintiff) is of diverse citizenship from Defendant, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.

21.     This Court has personal jurisdiction over Defendants because each Defendant has its principal headquarters in Illinois, does business in Illinois, directly or through agents, and has sufficient minimum contacts with Illinois such that it has intentionally availed itself of the laws of the United States and Illinois.

22.     Venue is proper under 28 U.S.C. § 1391(a) through (d) because Defendants' headquarters and principal place of business are located in this District, Defendants reside in this District, and substantial parts of the events or omissions giving rise to the claims occurred in or

CLASS ACTION COMPLAINT

emanated from this District, including, without limitation, decisions made by Defendants' governance and management personnel.

## III.    PARTIES

### A.    Plaintiff

23.    Kimberleigh Duffield is a resident of Norco, California.

### B.    Defendants

24.    **Defendant The Allstate Corporation** is a United States public corporation headquartered in Chicago, Illinois, and incorporated under the laws of Illinois. Together with its subsidiaries, Defendant The Allstate Corporation provides insurance products, including car insurance, throughout the United States, including Illinois.

25.    **Defendant Allstate Insurance Company** is a wholly owned subsidiary of The Allstate Corporation and is headquartered in Northbrook, Illinois, and incorporated under the laws of Illinois. Defendant Allstate Insurance Company provides insurance products, including car insurance, throughout the United States, including Illinois.

26.    **Defendant Allstate Vehicle and Property Insurance Company** is a subsidiary of The Allstate Corporation and is headquartered in Northbrook, Illinois, and incorporated under the laws of Illinois. Defendant Allstate Vehicle and Property Insurance Company provides insurance products, including car insurance, throughout the United States, including Illinois.

27.    **Defendant Arity, LLC,** was founded by The Allstate Corporation in 2016 and is a wholly owned subsidiary of The Allstate Corporation. Its headquarters is in Northbrook, Illinois, and it is incorporated under the laws of Illinois. Defendant Arity, LLC, is a mobility data and analytics company that, together with the other subsidiaries of Defendant The Allstate

CLASS ACTION COMPLAINT

Corporation, collects and analyzes data obtained throughout the United States, including the State of Illinois, and uses predictive analytics to build solutions to sell to third parties.

28.     **Defendant Arity 875, LLC,** was founded by The Allstate Corporation in 2016 and is a wholly owned subsidiary of The Allstate Corporation. Its headquarters is in Northbrook, Illinois, and it is incorporated under the laws of Illinois. Defendant Arity 875, LLC, is a mobility data and analytics company that, together with the other subsidiaries of Defendant The Allstate Corporation, collects and analyzes data obtained throughout the United States, including the State of Illinois, and uses predictive analytics to build solutions to sell to third parties.

29.     **Defendant Arity Services, LLC,** was founded by The Allstate Corporation in 2016 and is a wholly owned subsidiary of The Allstate Corporation. Its headquarters is in Chicago, Illinois, and it is incorporated under the laws of Illinois. Defendant Arity Services, LLC, is a mobility data and analytics company that, together with the other subsidiaries of Defendant The Allstate Corporation, collects and analyzes data obtained throughout the United States, including the State of Illinois, and uses predictive analytics to build solutions to sell to third parties.

## IV.     FACTS

30.     Defendants have amassed the data of at least forty-five million Americans, including Plaintiff.[5] Defendants obtained the data without consumers' knowing by integrating a piece of software into various mobile apps that enabled them to collect data directly from consumers' phones. Defendants have monetized this data in a variety of ways, including by building and selling Insurers access to the "world's largest driving behavior database," which

---

[5] ARITY, "Vehicle Miles Traveled," https://arity.com/solutions/vehicle-miles-traveled/, (last visited Jan. 16, 2024).

CLASS ACTION COMPLAINT

contains the driving behavior data of over 45 million Americans.[6]  Defendants never notified consumers nor obtained their consent to collect or sell their data.

31.    On information and belief, in 2015 Defendants designed a software development kit ("SDK") that could be integrated into mobile phone applications to collect data about the location and movements of a person's phone. In general, SDKs can provide app developers a helpful tool to build and develop their apps. SDKs usually consist of a set of tools (APIs, software, etc.) with preprogrammed functions that are integrated into an app and operate in the background. But the SDK Defendants developed was little more than a method for Defendants to scrape user data from several third-party apps under the pretext of providing a necessary function. Specifically, Defendants designed the Arity Driving Engine SDK ("Arity SDK") to collect an immense amount of granular data points from or about the location of a person's mobile phone ("Arity SDK Data").

## I.    Defendants Developed Software to Covertly Collect Consumers' Location Data

34.    Once installed in a mobile app, the Arity SDK harvested several types of data, including but not limited to:

a.    a mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b.    "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

c.    "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

d.    "Derived events," such as acceleration, speeding, distracted driving, crash

---

[6] ARITY, *supra* note 1.

detection, and attributes such as start and end location, start and end time, speed

attribute, rate of change attribute, and signal strength attribute; and

e.  Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device

type, app version, and OS version.

35.    Because the Arity SDK operated and collected data in the background, absent being

notified by Defendants or the app, users would be kept in the dark about the Arity SDK's existence.

36.    App users would likewise be unaware that Defendants were directly collecting

Arity SDK Data from their phones. Defendants never notified nor otherwise informed consumers

that they were collecting their data via the Arity SDK and the apps.

**II.    Defendants Paid to Integrate the Arity SDK into Mobile Apps**

37.    Since at least 2017, Defendants have been "licensing" the Arity SDK by paying

app developers millions of dollars to integrate the Arity SDK into their respective mobile apps.

38.    On information and belief, to avoid alerting consumers of their data collection,

Defendants only sought to partner with apps that, prior to contracting with Defendants, already

contained features that relied on location information to function properly. The apps that integrated

the Arity SDK included Routely, Life360, GasBuddy, and Fuel Rewards.

39.    Each of these apps routinely requested and received permission from users to use

their location information to enable certain in-app features prior to integrating the Arity SDK. But

after an app integrated the Arity SDK, if an app user allowed the app to access their location

information for those same in-app features, the user was also unwittingly enabling Defendants to

collect the Arity SDK Data via the Arity SDK.

40.    Defendants' agreements with app developers generally had similar key provisions,

granted app developers a limited license to integrate the Arity SDK into the developer's mobile

app. Once integrated into an app, Defendants were permitted to use the Arity SDK to collect and use the Arity SDK Data from app users' mobile phones.

41.     Pursuant to their agreements with the app developers, Defendants owned any Arity SDK Data they collected from an app user and were permitted to use the Arity SDK Data for their own independent purposes. Defendants further agreed to license or transfer subsets of the Arity SDK Data to the app developers to use to support specific features in their apps, such as displaying a summary of a user's trip and fuel efficiency.

42.     On information and belief, the Arity SDK Data in isolation could not (or at least could not reliably) be linked to a specific individual. To allow Defendants to match specific individuals to the Arity SDK Data, the app publishers licensed the personal data that they collected from their users to Defendants. The personal data that mobile apps licensed to Defendants generally included first and last name, phone number, address, zip code, Mobile Advertising ID ("MAID"), device ID, and ad-ID (collectively, "Personal Data"). Upon combining the Personal Data with the Arity SDK Data, Defendants could more reliably identify the specific person being monitored by the Arity SDK.

## III.     Defendants Products and Services Monetized Consumers' Data

30.     One of the primary functions of the Arity SDK is to transmit a consumer's precise location back to Defendant.

31.     Defendants used the Arity SDK Data and Personal Data, alone and in conjunction with one another, to develop, advertise, and sell several different products and services to third parties, including Insurers, and used the Arity SDK Data and Personal Data for the Defendants' own underwriting purposes. Defendants' products and services included:

(a) Drivesight. In 2015, Defendants developed Drivesight to generate a driving score

CLASS ACTION COMPLAINT

based on Defendants' own scoring model by analyzing data and generating driving scores that assign a particular value to an individual's driving risk.

(b) ArityIQ. Defendants let companies, including Insurers, "[a]ccess actual driving behavior collected from mobile phones and connected vehicles to use at time of quote to more precisely price nearly any driver."[7]

(c) Arity Audiences. Defendants let companies, including Insurers, "[t]arget drivers based on risk, mileage, commuting habits" and "[m]ore effectively reach [their] ideal audiences with the best offers to eliminate wasted spend, increase retention, and achieve optimal customer LTV."[8] As part of this product, Defendants displayed ads to the users of apps that agreed to integrate the Arity SDK.

(d) Real Time Insights. Defendants advertised that their business customers could "[r]eceive granular driver probe and event data for real-time applications."[9]

(e) Routely. Defendants offer consumers Routely, a "free" application which purports to provide "helpful insights" into the consumers' driver data. By contrast, when marketing to Insurers, Defendants describe Routely as "telematics in a box" that Insurers can use to "more accurately identify drivers with riskier driving profiles based on actual driving data, provide personalized discounts or surcharges at renewal, promote safer driving habits, and improve retention of [their] safer drivers."[10]

---

[7] ARITY, "Arity IQ," https://arity.com/solutions/arity-iq/ (last visited Jan. 16, 2025).
[8] ARITY, "Arity Audiences," arity.com/solutions/arity-audiences/ (last visited Jan. 16, 2025).
[9] ARITY, "Real Time Insights," https://arity.com/solutions/real-time-insights/ (last visited Jan. 16, 2025).
[10] ARITY, "Routely," https://arity.com/solutions/routely/ (last visited Jan. 16, 2025).

32.     Defendants primarily marketed the Arity SDK Data to third parties as "driving behavior" data as opposed to what the Arity SDK Data really is: highly detailed and sensitive data about the movements of a person's mobile phone.

33.     On information and belief, Defendants had no way to reliably determine whether a person was driving at the time Defendants collected the Arity SDK Data.

34.     If a person was riding as a passenger in a taxi, bus, or vehicle, those movements were still attributed to them even though they were not the driver. In these instances, if the vehicle's driver sped, hard braked, or made a sharp turn, Defendants would nonetheless conclude that the passenger, not the actual driver, engaged in "bad" driving behavior based on the Arity SDK Data.[11]

35.     Defendants then subsequently sell and share the data for use in informing decisions about that passenger's insurability based on their "bad" driving behavior. Defendants' public advertising for their products and services do not disclose the limitations of the Arity SDK Data.

36.     To potentially account for the Arity SDK Data's limitations, Defendants sought to combine the SDK Data with data collected directly from vehicles. In conjunction with this, Defendants began purchasing consumers' driving-related data from car manufacturers, such as Toyota, Lexus, Mazda, Chrysler, Dodge, Fiat, Jeep, Maserati, and Ram.

37.     On information and belief, consumers did not consent, nor were otherwise aware that, Defendants purchased their driving-related data from these car manufacturers.

---

[11] As a further example, it was publicly reported that a person's driving score was lowered because the "driving" behavior data collected from his phone claimed he was driving when he was actually riding a roller coaster. *See* Chad Murray, "Sir, this is a roller coaster. Car insurance dings driving score for man riding The Beast," CINCINNATI ENQUIRER, https://www.cincinnati.com/story/entertainment/2024/10/08/insurance-cuts-driving-score-man-riding-the-beast- kings-island/75554987007/.

CLASS ACTION COMPLAINT

38.     The Arity SDK records the location data regardless of whether the device is being actively used or idle, collecting the data and transmitting it back to Defendants as often as every few seconds.

39.     By designing the Arity SDK to regularly transmit users' location data, Defendants thus collect highly sensitive information from consumers, including where they live, work, worship, send themselves or their children to school or obtain child care, receive medical treatment, go to rallies, demonstrations, or protests, and any other information that can be gleaned from tracking a person's day-to-day movements. Defendants collect the foregoing along with several identifiers (including the MAID), aggregated with other demographic and user-specific personally identifying data.

40.     Despite collecting vast amounts of consumer location and other data for consumer advertising and targeting purposes, Defendants do not disclose its practice of collecting and sharing vast amounts of location and device use data when seeking a user's consent to data location collection. Defendants fail to obtain informed consent in apps.

**IV.     Defendants' Lack of Privacy Disclosures**

41.     Defendants had varying levels of control over the privacy disclosures and consent language that app developers presented to consumers.

42.     However, neither Defendants, nor the apps on Defendants' behalf, informed consumers that Defendants were collecting Arity SDK Data. Nor did Defendants, nor the apps on Defendants' behalf, inform consumers of the various ways that Defendants would collect, use, and ultimately monetize the Arity SDK Data.

43.     For example, Life360 merely told app users that it needed location sharing turned on "to enable data use for the in-app map, Place Alerts, and location sharing with [a user's] Circle."

Nowhere did Life360 even mention Defendants' existence, let alone any of Defendants' data collection or sales.

44.     The general lack of consumer consent is underscored by the reality that many app users may have downloaded the particular app several years prior to its implementation of the Arity SDK.

45.     Because Defendants did not disclose their conduct, consumers were wholly unaware that Defendants were collecting the Arity SDK Data from their phone or that Defendants would use the Arity SDK Data to create and sell several different products and services to third parties, including Insurers.

46.     Defendants did not provide consumers with any sort of notice of their data and privacy practices, nor did the mobile apps notify consumers about Defendants' practices on Defendants' behalf. *See* Figure 1. Similarly, neither Defendants nor the mobile apps notified consumers of the ways in which their SDK Data would be used, nor did consumers agree to have their data used for Defendants' own products or services. *See id*.

CLASS ACTION COMPLAINT



Figure 1

47.     Even if a consumer took the extra step to investigate Defendants outside of their app, navigated to Defendants' website, and located their privacy disclosures, they would still not understand what Defendants did with their data. Consumers reading Defendants' privacy disclosures are met with a series of untrue and contradictory statements that do not reflect Defendants' practices.

48.     For example, Defendants state that they "do not sell personal information for

monetary value," which is untrue. Defendants sold a number of data-based products and services for monetary value that linked a specific app user to their alleged driving behavior. Further, Defendants do not provide consumers with the ability to request that Defendants stop selling their data.

49.     Defendants likewise obscured how they used consumers' data. In Defendants' privacy disclosures, Defendants state that they "[u]se [consumers'] personal data for analytics and profiling." But in describing how Defendants "profile" consumers, the description does not reflect their actual "profiling" conduct—which consisted of Defendants combining the Arity SDK Data and Personal Data to create a database of driving profiles for more than forty-five million Americans and selling access to said database. Rather Defendants describe their profiling activities as follows:

> "We use your personal data to assist in our development of predictive driving models. We may profile [consumers'] personal data only for the purposes of creating a driving score ('Driving Score'), which is used for our analytics purposes to develop and validate our predictive driving models." See Attach. 1, Ex. A.

51.     Even if a consumer took the extraordinary steps of tracking down Defendants' privacy statement, finding the subparagraph describing profiling, parsing through the convoluted description of their profiling activities, and concluding that they did not want Defendants to use their data to create a "Driving Score" about them, consumers still could do nothing to stop Defendants from collecting their data and creating a Driving Score. Defendants did not describe, nor provide, a method for a consumer to request that their data not be used to profile them.

52.     Similarly, if a consumer concluded they did not want Defendants to use their data for targeted advertising, Defendants instructed them that they could "[l]earn how to opt out of targeted advertising" by visiting another link. But if a consumer followed that link, they would be

taken to a page that—instead of offering them a way to submit a request to opt out of targeted advertising—only provided them with links to several third-party websites, such as the Apple Support Center.

53. These third-party websites merely contained explanations regarding how a consumer could turn off certain types of targeted advertising and did not contain a way for a consumer to submit an actual request to Defendants specifically.

## V. Defendants' Practices Cause Substantial Injury to Consumers

54. As described above, the Arity SDK Data may be used to identify individual consumers and their visits to sensitive locations. The collection and sale of such data poses an unwarranted and unauthorized intrusion into the most private areas of a consumer's life and caused, or is likely to cause, substantial injury to the consumers and their privacy interests.

55. Additionally, Defendants' practice of obtaining and using additional data and information concerning consumers, alone and in combination with the geo-location data, all without users' consent, is likely to result in consumer injury.

56. Precise geolocation data associated with Apple's IDFA and Android's ADID, collectively referred to herein as MAIDs (mobile advertising identifiers), such as the data surreptitiously collected and sold by Defendants, may be used to track consumers to sensitive locations.

## VI. Plaintiff's Injuries

57. As described above, the data collected, retained, purchased, and sold by Defendants may be used to identify individual consumers and their visits to sensitive locations. The collection and sale of such data poses an unwarranted and unauthorized intrusion into the most private areas

of a consumer's life and caused, or is likely to cause, substantial injury to the consumers and their privacy interests.

58.     Plaintiff Duffield is a resident and citizen of the state of California who resides in Norco, California.

59.     Plaintiff's cell phone contains mobile applications that have embedded Defendants' Arity SDK.

60.     On information and belief, the Arity SDK harvested several types of data from Plaintiff's phone without her knowledge or consent, including but not limited to her:

(a) a mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

(b) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

(c) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

(d) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

(e) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

61.     Plaintiff was unaware that the Arity SDK was installed on her phone, much less that it was silently and surreptitiously collecting her granular location data and other types of data, including her driving data.

62.     Plaintiff did not consent to Defendants' conduct, nor does she have any relationship with the Defendants.

63.     Plaintiff's car insurance policy was issued by Farmers Insurance Group, and her insurance premiums have drastically increased despite her good driving habits.

64.    Plaintiff has noticed a significant increase over the law few years as opposed to a steady increase that would be expected from year to year. Importantly, Plaintiff has not had any accidents, speeding tickets, or other moving violations that could be attributed to these staunch and unexpected increases.

65.    Upon information and belief, the increased premiums and inflated price quotes suffered by Plaintiff are the result of insurers being provided with the uncontextualized, misleading, and unconsented-to personal Driving Data compiled by Defendants.

66.    Plaintiff's driving data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of her driving data, which is in the possession of third parties who have used and will use it for their own financial advantage.

67.    Plaintiff had a reasonable expectation of privacy in her vehicle, including details data about her location, routes, schedule, and driving behaviors would not be collected or shared without her express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing her driving data invaded Plaintiff's privacy rights.

## V.    CLASS ALLEGATIONS

68.    Plaintiff seeks to represent a class defined as all persons in the United States whose data, including but not limited to their geolocation data, was sold by Defendant without their consent (the "Class").

32.    Plaintiff also seeks to represent a subclass defined as all Class members who reside in the State of California whose data, including but not limited to their geolocation data, was sold by Defendant without their consent (the "California Subclass")

33.    Excluded from the Class are the Defendants and their officers, directors, management, employees, subsidiaries, or affiliates. Also excluded are the district judge or

CLASS ACTION COMPLAINT

magistrate judge to whom this case is assigned, as well as those judges' immediate family members, judicial officers and their personnel, and all governmental entities.

34.     Plaintiff reserves the right to expand, limit, modify, or amend the class definition, including the addition of one or more subclasses, in connection with her motion for class certification, or at any other time, based on, inter alia, changing circumstances and/or new facts obtained.

35.     **Numerosity:** Members of the Class are so numerous that joinder is impracticable. There are at least tens of thousands of members of the Class, geographically dispersed throughout the United States, such that joinder of all Class members is impracticable. There are at least thousands of members of the Subclass, such that joinder of all Subclass members is likewise impracticable.

36.     **Typicality:** Plaintiff's claims are typical of the claims of the other Class members. The factual and legal bases of Defendants' liability are the same and resulted in injury to Plaintiff and all other members of the Class.

37.     **Adequate representation:** Plaintiff will represent and protect the interests of the Class both fairly and adequately. Plaintiff has retained counsel competent and experienced in complex class-action litigation. Plaintiff has no interests that are antagonistic to those of the Class, and her interests do not conflict with the interests of the Class members she seeks to represent.

38.     **Commonality and Predominance:** Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the Class and because Class members share a common injury. Thus, determining damages with respect to the Class as a whole is appropriate. The common applicability of the relevant facts to claims of Plaintiff and the

proposed Class are inherent in Defendants' wrongful conduct because the injuries incurred by Plaintiff and each member of the Class arose from the same conduct alleged herein.

39.     There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

      a.   Whether Defendants collected Plaintiff's and Class Members' Driving data;

      b.   Whether Plaintiff and Class Members consented to such collection;

      c.   Whether Plaintiff and Class Members consented to have their Driving Data shared with third parties;

      d.   Whether Defendants were unjustly enriched to the detriment of Plaintiff;

      e.   Whether Defendants obtained Plaintiff's and Class Members' data without consent;

      f.   Whether Defendants' Arity SDK and related programs designed to collect Plaintiff and Class Members' granular location data and other data points constitutes a pin register or trap and trace device within the meaning of California Penal Code section 638.51;

      g.   Whether Defendants, through the actions alleged in this complaint, violated the right to privacy enshrined in California Constitution Article I, Section I and Plaintiff's and Class Members' common law privacy rights;

      h.   Whether Defendants violated numerous California state statutes and consumer protection laws including the California Invasion of Privacy Act, Computer Data Access and Fraud Act, and Unfair Competition Law.

      i.   Whether Defendants' conduct constitutes violations of the Federal Wiretap Act and/or Stored Communications Act;

CLASS ACTION COMPLAINT

j.   Whether Defendants' conduct was knowing and willful;

k.   Whether consumers and Class members have been damaged by Defendants' conduct and the amount of such damages; and

l.   The nature and scope of appropriate injunctive relief.

40.   **Superiority:** Class proceedings on these facts are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the Class could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

41.   Class certification is also appropriate under Rules 23(b)(1), (b)(2), and/or (c)(4) because:

- The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants;

- The prosecution of separate actions by individual Class Members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests;

- Defendants have acted or refused to act on grounds generally applicable to the Class, making injunctive and corresponding declaratory relief appropriate with respect to the Class as a whole; and

- The claims of Class Members are comprised of common issues whose resolution in a class trial would materially advance this litigation.

## TOLLING OF THE STATUTES OF LIMITATIONS

42. All applicable statute(s) of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiff and Class Members could not have reasonably discovered Defendants' practice of surreptitiously acquiring and compiling their sensitive location data without their consent, selling it to third-parties, and/or compiling it in a manner that impacts their insurance premiums—including when the data gathered does not accurately reflect Plaintiff or Class Members' driving habits.

43. Defendants were and remain under a continuing duty to disclose to Plaintiff and Class Members their practice of acquiring sensitive location data for use in determining insurance premiums. As a result of the active concealment by Defendants, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## VI.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF THE FEDERAL WIRETAP ACT,
### 18 U.S.C. §§ 2510, *et seq.*
### (ON BEHALF OF PLAINTIFF AND CLASS)

44. Plaintiff incorporates the above allegations by reference as if fully set forth herein.

45. The Federal Wiretap Act ("FWA"), as amended by the Electronic Communications Privacy Act of 1986 ("ECPA"), prohibits the intentional interception, use, or disclosure of any wire, oral, or electronic communication.

46.     In relevant part, the FWA prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring "any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a).

47.     The FWA also makes it unlawful for any person to intentionally disclose, or endeavor to disclose, to any other person or to intentionally use, or endeavor to use, the "contents of any wire, oral, or electronic communication, knowing or having reason to know that" the communication was obtained in violation of the FWA. 18 U.S.C. § 2511(1)(c) & (d).

48.     The FWA provides a private right of action to any person whose wire, oral, or electronic communication is intercepted, used, or disclosed. 18 U.S.C. § 2520(a).

49.     The FWA defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

50.     The FWA defines "electronic communication" as "any transfer of signs, signals, . . . data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

51.     The FWA defines "electronic, mechanical, or other device" as "any device or apparatus which can be used to intercept a wire, oral, or electronic communication." 18 U.S.C. § 2510(5).

52.     The FWA defines "contents," with respect to any covered communication, to include "any information concerning the substance, purport, or meaning of that communication[.]" 18 U.S.C. § 2510(8).

53. The FWA defines "person" to include "any individual, partnership, association, joint stock company, trust, or corporation[.]" 18 U.S.C. § 2510(6).

54. Defendants, corporations, are each a person as defined by 18 U.S.C. § 2510(6).

55. As alleged herein, the Defendants have intercepted, in real time and as they were transmitted, the contents of electronic communications.

56. The data and transmissions within, to, and from Plaintiff's and Class Members' phones constitute "electronic communications," as defined by 18 U.S.C. § 2510(12), as they are transfers of signals, data, and intelligence transmitted by electromagnetic, photoelectronic or photo optical systems that affect interstate commerce.

57. Defendants intercepted these transmissions via the Arity SDK.

58. As detailed herein, the electronic communications are tied to individuals and not anonymized because, on information and belief, the Arity SDK collects app users' mobile device identifiers and other information that app developers provide to Defendants.

59. Plaintiff and Class Members have a reasonable expectation of privacy within their phones. Further, there is a reasonable expectation that the activities a person conducts with their phones, *i.e.*, app usage and data related thereto, are private.

60. Common understanding of how smartphones work creates a reasonable expectation that Defendants would not intercept and divert the electronic communications described above.

61. In further violation of the FWA, Defendants have intentionally used or endeavored to use the contents of the communications described above knowing or having reason to know that the information was obtained through interception in violation of 18 U.S.C. §2511(1)(a). 18 U.S.C. §2511(1)(d).

CLASS ACTION COMPLAINT

62. Specifically, Defendants have used the contents of the communications described above to increase driving insurance premiums for members of the Class for their own financial and commercial benefit, obtaining substantial profit.

63. As a result, Plaintiff and Class Members have suffered harm and injury due to the interception, disclosure, and/or use of communications containing their private and Personal Information.

64. Pursuant to 18 U.S.C. § 2520, Plaintiff and Class Members have been damaged by the interception, disclosure, and/or use of their communications in violation of the Wiretap Act and are entitled to: (1) appropriate equitable or declaratory relief; (2) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiff and the Class and any profits made by Defendants as a result of the violation or (b) statutory damages for each Class Member of whichever is the greater of $100 per day per violation or $10,000; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

65. Plaintiff and Class Members seek compensatory, injunctive, and equitable relief in an amount to be determined at trial, including an award of reasonable attorneys' fees and costs and punitive or exemplary damages for Defendants' willful violations.

**SECOND CAUSE OF ACTION**
**VIOLATION OF THE STORED COMMUNICATIONS ACT**
**18 U.S.C. §§ 2701, et seq.**
**(ON BEHALF OF PLAINTIFF AND THE CLASS)**

66. Plaintiff incorporates the above allegations by reference as if fully set forth herein.

67. The Federal Stored Communications Act ("SCA"), enacted in 1986 as part of the Electronic Communications Privacy Act ("ECPA"), creates a civil remedy for those whose stored electronic communications have been obtained by one who "intentionally accesses without

authorization" or "intentionally exceeds an authorization to access" a facility through which an electronic communication service ("ECS") is provided. 18 U.S.C. §§ 2701, 2707.

68.     The Act reflects Congress's judgment that users have a legitimate interest in the confidentiality and privacy of communications in electronic storage.

69.     "Electronic communication" is defined as "any transfer of signs, signals, . . . data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

70.     "Electronic communication service" means "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15) (incorporated by reference in 18 U.S.C. § 2711(1)).

71.     "Electronic storage" is defined as "(A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication ...." 18 U.S.C. §§ 2510(17) (incorporated by reference in 18 U.S.C. § 2711(1)).

72.     Plaintiff, an individual, and Defendants, as corporations or legal entities, are "persons" within the meaning of 18 U.S.C. § 2510(6), and for purposes of 18 U.S.C. § 2707.

73.     The data and transmissions within, to, and from Plaintiff's and Class Members' phones constitute "electronic communications," as defined by 18 U.S.C. § 2510(12).

74.     Plaintiff's and Class Members' data were intercepted by Defendants' SDK, and stored on their own servers, unbeknownst to Plaintiff and Class Members.

75.    The electronic communications Defendants intercepted are tied to individuals and not anonymized.

76.    There is a reasonable expectation of privacy within a person's electronic communications, and Plaintiff and Class Members reasonably expected privacy while using their phones..

77.    Plaintiff and Class Members did not authorize Defendants to access their phones or the communications stored within them.

78.    Defendants intentionally accessed these communications without authorization.

79.    Defendants intentionally exceeded their authority to access these communications without authorization.

80.    Defendants violated the SCA, 18 U.S.C. § 2701 by accessing Plaintiff's and Class Member's phones and private data without authorization and by obtaining access to the electronic communications stored on their devices.

81.    Defendants conduct was willful and intentional, and it invaded Plaintiff's and Class Members' expectations of privacy.

82.    Defendants have profited from their violation of the SCA, by, among other things, using improperly accessed communications and highly sensitive Arity SDK Data for Defendants' commercial gain and benefit.

83.    The communications unlawfully accessed by Defendants have significant value, evidenced by the expenditures made by Defendants in order to deploy the Arity SDK's across applications and to collect information directly from vehicles.

84.    Because of Defendants conduct, Plaintiff and Class Members have forever lost the value of their data, their privacy interest in the data, and their control over its use.

85.     Because Plaintiff and Class Members have been aggrieved by Defendants' intentional acts in violation of the SCA, they are entitled to bring this civil action to recover relief and damages. 18 U.S.C. § 2707.

86.     As a result of Defendants' conduct, Plaintiff and Class Members are entitled to all damages set forth in 18 U.S.C. § 2707 including declaratory and equitable relief, compensatory damages measured by actual damages and Defendants' profits, reasonable attorneys' fees and costs, all available statutory relief, and punitive damages as determined by the Court.

## THIRD CAUSE OF ACTION
## VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT
## 18 U.S.C. § 1030 *et seq.*
## (ON BEHALF OF PLAINTIFF AND THE CLASS)

87.     Plaintiff incorporates the above allegations by reference as if fully set forth herein.

88.     The Computer Fraud and Abuse Act ("CFAA"), enacted in 1986 as part of the ECPA, prohibits the intentional accessing, without authorization or in excess of authorization, of a computer under certain circumstances. 18 U.S.C. § 1030(a).

89.     The Act reflects Congress's judgment that users have a legitimate interest in the confidentiality and privacy of information within their computers.

90.     The CFAA specifically provides that it is unlawful to "intentionally access a computer without authorization or exceed[] authorized access, and thereby obtain[]…information from any protected computer." 18 U.S.C. § 1030(a)(2)(c).

91.     The CFAA also specifically provides that it is unlawful to "knowingly and with intent to defraud, access[] a protected computer without authorization or exceed[ing] authorized access" and thereby "further[] the intended fraud and obtain[] anything of value…." 18 U.S.C. § 1030(a)(4).

92.     Plaintiff and Defendants, as corporations or legal entities, are "persons" within the meaning of the CFAA. 18 U.S.C. § 1030(e)(12).

93.     A "computer" is defined as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." 18 U.S.C. § 1030(e)(10).

94.     "Exceeds authorized access" is defined as "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain." 18 U.S.C. § 1030(e)(6).

95.     A "protected computer" is defined as "a computer . . . which is used in or affecting interstate or foreign commerce or communication…, [or that] has moved in or otherwise affects interstate or foreign commerce." 18 U.S.C. § 1030(e)(2)(B).

96.     Plaintiff's and Class Members' phones constitute a "computer" within the meaning of the CFAA. 18 U.S.C. § 1030(e)(1).

97.     The phones of Plaintiff and Class Members are used in and affect interstate and foreign commerce and constitute "protected computers" within the meaning of the CFAA. 18 U.S.C. § 1030(e)(2)(B).

98.     Defendants intentionally accessed the protected computers in Plaintiff's and Class Members' possession via the Arity SDK and other software without Plaintiff's or Class Members' authorization, or in a manner that exceeded Plaintiff's and Class Members' authorization, and obtained information therefrom in violation of the CFAA. 18 U.S.C. § 1030(a)(2)(C).

99.     As alleged herein, Defendants' conduct constituted a knowing intent to defraud Plaintiff and Class Members of their valuable Personal Data and profit thereby. 18 U.S.C. §1030(a)(4).

100.     Defendants' use of MAIDs, IDFAs, IDFVs and its SDK constitutes access to Plaintiff's and Class Members' smartphones.

101.     The value of the information Defendants obtained from the protected computers in Plaintiff's and Class Members' possession exceeded $5,000 in a one-year period, as evidenced by Defendants' significant profits from the disclosures of this information. 18 U.S.C. § 1030(a)(4).

102.     Plaintiff and Class Members have suffered harm and injury due to Defendants' unauthorized access to their smartphones.

103.     A civil action for violation of the CFAA is proper if the conduct involves "loss to 1 or more persons during any 1-year period … aggregating at least $5,000 in value." Because the loss to Plaintiff and Class Members during any one-year period within the relevant timeframe, including the loss of their privacy interest in and control over their Personal Data, exceeded $5,000 in the aggregate, Plaintiff and the Class are entitled to bring this civil action and are entitled to economic damages, compensatory damages, injunctive, equitable, and all available statutory relief, as well as their reasonable attorney's fees and costs and other relief as permitted by the CFAA. 18 U.S.C. § 1030(g).

### FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### UNJUST ENRICHMENT
### (ON BEHALF OF PLAINTIFF AND THE CLASS)

104.     Plaintiff incorporates the above allegations by reference as if fully set forth herein.

105.     To the extent required by law, Plaintiff brings this claim in the alternative to any legal claims that may be alleged.

106.    Plaintiff also alternatively alleges this claim as a Quasi-Contract or Non-Quasi-Contract Claim for Restitution and Disgorgement.

107.    Plaintiff and Class members unwittingly conferred a benefit upon Defendants—their valuable driving data, highly sensitive personal data, and any other related data points harvested by the Arity SDK and Defendants.

108.    Defendants acquired this data unlawfully and then sold it to other parties without the consent of Plaintiff and Class members.

109.    Plaintiff and Class members received nothing from this transaction. Plaintiff lacks an adequate remedy at law, and pleads this cause of action in the alternative to the extent Plaintiff is required to do so.

110.    Defendant has knowledge of such benefits, which is evidenced from its business model and its relationships with third party mobile application developers.

111.    Defendant has been unjustly enriched in retaining the revenues derived from the sale of Plaintiff's and Class members' data. Retention of those moneys under these circumstances is unjust and inequitable because Defendant acted unlawfully and without Plaintiff's and Class Members' consent.

112.    Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and Class Members is unjust and inequitable, Defendant must pay restitution to Plaintiff and the Class Members.

113.    Plaintiff and the members of the Class lack an adequate remedy at law to address the unfair conduct at issue here. Legal remedies available to Plaintiff and class members are inadequate because they are not equally prompt and certain and in other ways efficient as

equitable relief. Damages are not equally certain as restitution because the standard that governs restitution is different than the standard that governs damages.

114.    Unlike damages, restitution is not limited to the amount of money a defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles the plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize.

115.    Plaintiff and members of the putative class seek non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of its unjust conduct.

**FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS**
**INVASION OF PRIVACY**
**(ON BEHALF OF PLAINTIFF AND THE CLASS)**

116.    Plaintiff incorporates the above allegations by reference as if fully set forth herein.

117.    Plaintiff and Class Members have a common law, legally or constitutionally-protected privacy interest in their driving data and are entitled to the protection of their driving data against unauthorized access.

118.    Plaintiff and Class Members have a reasonable expectation of privacy in their driving abilities, habits, patterns, and behavior engaged in while they are in their own vehicles, and in any compilation of highly personalized driving behavior profile resulting from the collection of such data.

119.    As Plaintiff and Class Members drive their cars to work, visit family, or simply go about their day, they have unknowingly creates troves of highly sensitive data mapping their respective personal lives which is then collected, captured, transmitted, accessed, compiled, stored, analyzed, and sold—all without their knowledge or informed consent.

120.     The continued nonconsensual surveillance of an individual in their private capacity, as Defendants have done and continue to do, represents a fundamental violation of personal privacy, freedom, and autonomy. It is not simply an intentional intrusion but a profound and egregious infringement upon the most personal and sacred aspects of one's life. Plaintiff and Class Members have unknowingly been subjected to constant observation while they go about their days, which destabilizes the very essence of personal liberty.

121.     As a result of Defendants' intentionally intrusive conduct, Plaintiff and Class Members have been and still remain today under pervasive surveillance compromising their privacy, autonomy, and basic human dignity that our society relies upon and expects.

122.     Plaintiff and Class Members have a reasonable expectation that data regarding their locations, driving abilities, patterns, decisions, and habits engaged in while they are in their own vehicles would not be collected by Defendants without their express consent, and that such data would not be shared with or used by third parties without their express consent.

123.     Without the consent or knowledge of Plaintiff and Class Members, Defendants collected comprehensive Driving Data that Plaintiff and Class Members reasonably expected to remain private.

124.     Defendants then disclosed this highly personal and sensitive information to third parties, who used the information for commercial gain.

125.     Defendants intentionally invaded Plaintiff's and Class Members' privacy interests by deliberately designing SDK and programs that surreptitiously obtain, improperly gain knowledge of, review, retain, package, and sell their confidential driving history.

126.     Defendants' conduct is highly offensive to a reasonable person and constitutes an egregious breach of social norms underlying the right to privacy, as evidenced by substantial

research, literature, and governmental enforcement and investigative efforts to protect consumer privacy against surreptitious technological intrusions.

127. By tracking, collecting, storing, distributing, and selling Plaintiff's and Class Members' Driving Data without authorization or consent to do so, Defendants intentionally intruded upon Plaintiff's and Class Members' seclusion, solitude, and private life engaged in within the confines of their respective vehicles, without their knowledge or permission.

128. Defendants' conduct infringed Plaintiff's and Class Members' privacy interests by, among other things: (1) allowing the dissemination and/or misuse of their Driving Data; (2) preventing Plaintiff and Class Members from maintaining control over the type of information that GM track and/or record; and (3) preventing Plaintiff and Class Members from making personal decisions and/or conducting personal activities without observation, intrusion, or interference, including being able to drive without their Driving Data being intercepted and made publicly available without Plaintiff's and Class Members' knowledge or consent.

129. In sharing Plaintiff's and Class Members' Driving Data in inherently and contextually misleading fashions that inaccurately report Plaintiff's driving events and abilities, Defendants acted in reckless disregard of Plaintiff's and Class Members' privacy rights, intentionally and unlawfully intruded into their seclusion, and publicly disclosed their private data that was false or inaccurate.

130. Defendants' intentional intrusions unlawfully allowed access to Plaintiff's and Class Members' Driving Data as a service to third parties without consent. Plaintiff and Class Members did not receive any compensation in return for the improper use of their Driving Data. Defendants deprived Plaintiff and Class Members of the right to control how their Driving Data is collected, used, or disseminated and by whom.

131.    Defendants have improperly profited from their invasion of Plaintiff's and Class Members' privacy and their use of Plaintiff's and Class Members' Driving Data for their economic value and their own commercial gain.

132.    As a direct and proximate result of Defendants' unlawful invasions of privacy, Plaintiff's and Class Members' reasonable expectations of privacy were frustrated, exploited, compromised, and defeated.

133.    Plaintiff and Class Members were harmed by Defendants' wrongful conduct causing their loss of privacy and the confidentiality of their own private conduct within the confines of their own vehicle. Defendants have needlessly harmed Plaintiff by capturing their Driving Data through their connected services. This intrusion, disclosure of information, and loss of privacy and confidentiality has caused Plaintiff to suffer mental anguish, actual damages, lost value in their personal data, and an invasion of their privacy in an amount to be determined at trial.

134.    Unless and until enjoined, and restrained by order of this Court, Defendants' wrongful conduct will cause irreparable injury to Plaintiff and Class Members in that their Driving Data maintained by Defendants may be viewed, distributed, and used by unauthorized third parties for years to come.

135.    Plaintiff and Class Members seek nominal, compensatory, and punitive damages as a result of Defendants' actions. Plaintiff seeks actual damages suffered, plus any profits attributable to Defendants' use of Plaintiff's and Class Members' Driving Data. Punitive damages are warranted because Defendants' malicious, oppressive, and willful actions were done in conscious disregard of their rights. Punitive damages are also warranted to deter Defendants from engaging in future misconduct.

### SIXTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### CALIFORNIA CONSTITUTIONAL INVASION OF PRIVACY
### (ON BEHALF OF PLAINTIFF AND THE CALIFORNIA SUBCLASS)

136.    Plaintiff incorporates the above allegations by reference as if fully set forth herein.

137.    Article I, section I of the California Constitution states:

> All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and *privacy*.

Cal. Const. art I § 1.

138.    Plaintiff and California Class Members have an interest in precluding the dissemination and misuse of their geolocation, and other Personal Data by Defendants, and precluding the use of their personal property without observation, intrusion, or interference by Defendants.

139.    Plaintiff and California Class Members had a legitimate expectation of privacy regarding their Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

140.    Plaintiff and California Class Members had no knowledge and did not consent or authorize Defendants to obtain their driving telematics data or to share it with third parties, let alone the specific data brokers Defendants shared it with and/or sold it to.

141.    Plaintiff and California Class Members enjoyed objectively reasonable expectations of privacy surrounding their Personal data. Defendants' intrusion upon seclusion occurred the moment Defendants began tracking Plaintiff's and California Class Members' Personal Data, including driving telematics data.

142.    Defendants' conduct was intentional and intruded on Plaintiff's and California Class Members' use of their personal property.

143.     Defendants' conduct was highly offensive to a reasonable person because they shared and/or sold the data for reports for auto insurance companies to influence Plaintiff's and California Class Members' insurance rates without their prior knowledge or consent.

144.     As a direct and proximate result of Defendants' invasions of privacy, Plaintiff and California Class Members have suffered and will continue to suffer injury and damages, as alleged herein, including but not limited to overpayment for auto insurance services and decreased value of their driving telematics data.

145.     Plaintiff and California Class Members seek all relief available for invasion of privacy claims under the California Constitution, including nominal damages and general privacy damages.

## SEVENTH CAUSE OF ACTION
### Violation of the California Computer Data Access and Fraud Act
### Cal. Penal Code. § 502
### (ON BEHALF OF PLAINTIFF AND THE CALIFORNIA SUBCLASS)

146.     Plaintiff repeats, re-alleges, and incorporates by reference preceding paragraphs above as if fully set forth herein.

147.     The California legislature enacted the CDAFA with the intent of "expand[ing] the degree of protection afforded to individuals . . . from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a). The enactment of CDAFA was motivated by the finding that "the proliferation of computer technology has resulted in a concomitant proliferation of . . . unauthorized access to computers, computer systems, and computer data." Id.

148.     Plaintiff's and Class Members' smartphone constitute "computers" within the scope of the CDAFA.

149.     Defendants violated the following sections of the CDAFA:

150. Section 502(c)(1), which makes it unlawful to "knowingly access[] and without permission . . . use[] any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data;"

151. Section 502(c)(2), which makes it unlawful to "knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network;"

152. Section 502(c)(7), which makes it unlawful to "knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network."

153. Defendants knowingly accessed Plaintiff's and Class Members' smartphones without their permission by including within the SDK, that Defendants provide to developers, software that intercepts and transmits data, communications, and personal information concerning Plaintiff and Class Members.

154. Defendants used data, communications, and personal information that it intercepted and took from Plaintiff's and Class Members' smart phones to wrongfully and unjustly enrich itself at the expense of Plaintiff and Class Members.

155. Defendants took, copied, intercepted, and made use of data, communications, and personal information from Plaintiff's and Class Members' smartphones.

156. Defendants knowingly and without Plaintiff's and Class Members' permission accessed or caused to be their smartphones by installing without Plaintiff's and Class Members' informed consent software that intercepts and/or takes data, communications, and personal information concerning Plaintiff and Class Members.

CLASS ACTION COMPLAINT

157.     Plaintiff and Class Members are residents of California, and used their smartphones in California. Defendants accessed or caused to be accessed Plaintiff's and Class Members' data, communications, and personal information from California. On information and belief, Defendants use servers located in California that allow Defendants to access and process the data, communications and personal information concerning Plaintiff and Class Members.

158.     Defendants were unjustly enriched by intercepting, acquiring, taking, or using Plaintiff's and Class Members' data, communications, and personal information without their permission, and using it for Defendants' own financial benefit. Defendants have been unjustly enriched in an amount to be determined at trial.

159.     As a direct and proximate result of Defendants' violations of the CDAFA, Plaintiff and Class Members suffered damages.

160.     Pursuant to CDAFA Section 502(e)(1), Plaintiff and Class Members seek compensatory, injunctive, and equitable relief in an amount to be determined at trial.

161.     Pursuant to CDAFA Section 502(e)(2), Plaintiff and Class Members seek an award of reasonable attorneys' fees and costs.

162.     Pursuant to CDAFA Section 502(e)(4), Plaintiff and Class Members seek punitive or exemplary damages for Defendants' willful violations of the CDAFA.

**EIGTH CAUSE OF ACTION**
**Use of a Pen Register or Trap and Trace Device**
**Cal. Penal Code § 638.51**
**(ON BEHALF OF PLAINTIFF AND THE CALIFORNIA SUBCLASS)**

163.     Plaintiff repeats, re-alleges, and incorporates by reference preceding paragraphs above as if fully set forth herein.

164.     California Penal Code Section 638.50(b) defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted

by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

165.    California Penal Code Section 638.51 prohibits any person from using a pen register without a court order.

166.    Defendants' SDK constitutes a "pen register" because it is a device or process that records addressing or signaling information—Plaintiff's and Class Members' location data and personal information—from the electronic communications transmitted by their smartphones.

167.    Defendants were not authorized by any court order to use a pen register to track Plaintiff's and Class Members' location data and personal information.

168.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members suffered losses and were damaged in an amount to be determined at trial.

**NINTH CAUSE OF ACTION**
**Violation of the California Wiretapping Act**
**Cal. Penal Code § 631**
**(ON BEHALF OF PLAINTIFF AND THE CALIFORNIA SUBCLASS)**

169.    Plaintiff repeats, re-alleges, and incorporates by reference preceding paragraphs above as if fully set forth herein.

170.    At all relevant times, there was in full force and effect the California Wiretapping Act, Cal. Penal Code § 631.

171.    The California legislature enacted the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630, *et seq*., including the Wiretapping Act, "to protect the right of privacy" of residents of California. Cal. Penal Code § 630.

172.    The California legislature was motivated to enact CIPA by a concern that the "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy

CLASS ACTION COMPLAINT

resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.*

173.    The California Wiretapping Act prohibits:

> "any person [from using] any machine, instrument, [] contrivance, or in any other manner . . . [from making] any unauthorized connection, whether physically, electronically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section[.]

174.    Plaintiff's and Class Members' specific user input events and choices on their mobile devices that are tracked by Defendants' SDK communicates the user's affirmative actions, such as clicking a link, installing an app, selecting an option, or relaying a response, and constitute communications within the scope of the Wiretapping Act.

175.    Plaintiff and Class Members are residents of California, and used their smartphones within California. As such, Defendants intercept, read, or attempt to read Plaintiff's and Class Members' data, communications, and personal information in California.

176.    On information and belief, Defendants use servers in California to intercept, track, process, or otherwise use Plaintiff's and Class Members' data, communications, and personal information within California.

177.    Defendants intercept Plaintiff's and Class Members' communications while they are in transit to and from Plaintiff's and Class Members' smartphones and the apps, app

CLASS ACTION COMPLAINT

developers, and cellphone towers; Defendants transmit a copy of Plaintiff's and Class Members' communications to itself. Defendants use the contents of the communications and monetize them for its own pecuniary gain.

178.    Neither Defendants nor any other persons informed Plaintiff and Class Members that Defendants were intercepting and transmitting Plaintiff's private communications. Plaintiff and Class Members did not know Defendants were intercepting and recording their communications, as such they could not and did not consent for their communications to be intercepted by Defendants and thereafter transmitted to others.

179.    Defendants' SDK constitutes a machine, instrument, contrivance, or other manner to track and intercept Plaintiff's and Class Members' communications while they are using their smartphones.

180.    Defendants use and attempt to use or communicate the meaning of Plaintiff's and Class Members' communications by ascertaining their personal information, including their geolocation and places that they have visited, in order to monetize Plaintiff's and Class Members' personal information.

181.    At all relevant times to this complaint, Defendants intercepted and recorded components of Plaintiff's and the Class Members' private telephone communications and transmissions when Plaintiff and other Class Members used apps embedded with Defendants' software and Arity SDK via their cellular mobile access devices within the State of California.

182.    At all relevant times to this complaint, Plaintiff and the other Class Members did not know Defendants were engaging in such interception and recording and therefore could not provide consent to have any part of their private telephone communications intercepted and recorded by Defendants and thereafter transmitted to others.

183. At the inception of Defendants' illegally intercepted and stored Plaintiff's geolocation and other personal data, Defendants never advised Plaintiff or the other Class Members that any part of this sensitive personal data would be intercepted, recorded, and transmitted to third parties.

184. Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. See Matera v. Google Inc., 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); Bradley v. Google, Inc., 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); In re Facebook, Inc. Internet Tracking Litigation, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history).

185. Defendants' use of MAIDs, device IDs, and its SDK are both a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here.

186. At all relevant times, by using Defendants' SDK as well as tracking Plaintiff's and Class Members' geolocation, Defendants intentionally tapped, electrically or otherwise, the lines of internet communication between Plaintiff and class Members on the one hand, and the specific sites and locations Plaintiff and Class Members visited on the other.

187. At all relevant times, by using Defendants' geolocation tracking software technology, Defendants willfully and without the consent of all parties to the communication, or in any unauthorized manner, read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff and putative class Members, while the electronic

communications were in transit or passing over any wire, line or cable or were being sent from or received at any place within California.

188.     Plaintiff and Class Members did not consent to any of Defendants' actions in implementing these wiretaps within its geolocation tracking software. Nor have Plaintiff or Class Members consented to Defendants' intentional access, interception, reading, learning, recording, and collection of Plaintiff and Class Members' electronic communications.

189.     Plaintiff's and the Class Members devices of which Defendants accessed through its unauthorized actions included their computers, smart phones, and tablets and/or other electronic computing devices.

190.     Defendants violated Cal. Penal Code § 631 by knowingly accessing and without permission accessing Plaintiff's and Class Members' devices in order to obtain their personal information, including their device and location data and personal communications with others, and in order for Defendants to share that data with third parties, in violation of Plaintiff's and Class Members' reasonable expectations of privacy in their devices and data.

191.     Defendants violated Cal. Penal Code § 631 by knowingly and without permission intercepting, wiretapping, accessing, taking, and using Plaintiff's and the Class Members' personally identifiable information and personal communications with others.

192.     As a direct and proximate result of Defendants' violation of the Wiretapping Act, Plaintiff and Class Members were injured and suffered damages, a loss of privacy, and loss of the value of their personal information in an amount to be determined at trial.

193.     Defendants were unjustly enriched by its violation of the Wiretapping Act.

194. Pursuant to California Penal Code Section 637.2, Plaintiff and Class Members have been injured by Defendants' violation of the Wiretapping Act, and seek damages for the greater of $5,000 or three times the amount of actual damages, and injunctive relief.

**TENTH CAUSE OF ACTION**
**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, et seq.**
**(ON BEHALF OF PLAINTIFF AND THE CALIFORNIA SUBCLASS)**

195. Plaintiff repeats, re-alleges, and incorporates by reference preceding paragraphs above as if fully set forth herein.

196. Plaintiff lacks an adequate remedy at law.

197. California's Unfair Competition Law (UCL) defines "unfair competition" to include any "unlawful, unfair, or fraudulent" business act or practice. Cal. Bus. & Prof. Code §§ 17200 et seq.

198. Defendants have engaged in acts and practices that are unfair in violation of the UCL.

199. Each Defendant is a "person" as defined by Cal. Bus. & Prof. Code §17201.

200. Defendants committed unfair business practices by using their SDK as described herein, including in the state of California, and by selling the data to third-parties in the manner described herein, including data belonging to Plaintiff and the California Subclass.

201. Defendants acts and practices are unlawful because Defendants violation and continue to violation California common law, constitutional, and statutory rights to privacy, including but not limited to the California Constitution Article I, Section 1, CIPA, and CDAFA.

202. Defendant engaged in unfair, unconscionable, unlawful, and/or deceptive acts and practices in conducting trade and commerce in violation of the UCL by:

a. Intercepting, collecting, using, and selling Plaintiff's and California Subclass Members' driving data without their consent or knowledge;

b. Omitting, suppressing, and concealing the material fact that Defendants were intercepting, collecting, using, and selling Plaintiff's and California Subclass Members' driving data to third parties for their own financial gain and commercial benefit;

c. Paying mobile application developers to install the Arity SDK;

d. Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiff's and California Subclass Members' driving data.

203.    Defendants acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Plaintiff's and California Subclass Members' rights because Defendants intentionally intercepted, collected, used, and sold Plaintiff's and Subclass Members' driving data without obtaining their consent.

204.    In the course of their business, Defendants repeatedly and regularly engaged in the unlawful, unconscionable, and unfair acts or practices, which caused serious harm to consumers, including Plaintiff and California Subclass Members.

205.    Plaintiff's and California Subclass Members' driving data has tangible value. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, that driving data is in the possession of third parties who—along with Defendants—have used and will continue to use it for their commercial benefit.

206.    As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Plaintiff and California Subclass Members have suffered and will continue to suffer injury, including but not limited to: loss of privacy, unauthorized

CLASS ACTION COMPLAINT

dissemination of their valuable driving data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their driving data, and economic harm stemming from the exploitation of their driving data.

207.    Plaintiff and California Subclass Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendants' unlawful, unfair, and unconscionable practices or use of their driving data; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure section 1021.5; injunctive relief; and other appropriate equitable relief.

## **REQUEST FOR RELIEF**

Plaintiff, individually and on behalf of all other Class Members, respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendants as follows:

A. Certifying the Classes as requested herein, designating Plaintiff as Class representative, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding Plaintiff and the Classes appropriate monetary relief, including actual damages, statutory damages, and punitive damages;

C. Awarding Plaintiff and the Classes pre-judgment and post-judgment interest to the maximum extent allowable;

D. Awarding Plaintiff and the Classes reasonable attorneys' fees, costs, and expenses, as allowable; and

E. Awarding Plaintiff and the Classes such other favorable relief as allowable under law.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: January 17, 2025         Respectfully submitted,

*/s/ Gary M. Klinger*
Gary M. Klinger (Bar No. 6303726)
**MILBERG COLEMAN BRYSON**
 **PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
gklinger@milberg.com

Alexandra M. Honeycutt (Bar No. 039617)
**MILBERG COLEMAN BRYSON**
 **PHILLIPS GROSSMAN, PLLC**
800 S. Gay St., STE 1100
Knoxville, TN 37929
Telephone: (866) 252-0878
ahoneycutt@milberg.com

CLASS ACTION COMPLAINT